# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ROBERTO MEDINA, derivatively on behalf of, FLUOR CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>DAVID E. CONSTABLE, JAMES R. BREUER, JOHN C. REGAN, JOSEPH L. BRENNAN, ALAN M. BENNETT, ROSEMARY T. BERKERY, CHARLES BLANKENSHIP, JR., H. PAULETT EBERHART, LISA GLATCH, JAMES T. HACKETT, THOMAS C. LEPPERT, TERI P. MCCLURE, ARMANDO J. OLIVERA, and MATTHEW K. ROSE,<br><br>Defendants,<br><br>and<br><br>FLUOR CORPORATION,<br><br>Nominal Defendant. | Case No: 3:25-cv-02816<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Roberto Medina ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Fluor Corporation ("Fluor" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants David E. Constable ("Constable"), James R. Breuer ("Breuer"), John C. Regan ("Regan"), Joseph L. Brennan ("Brennan"), Alan M. Bennett ("Bennett"), Rosemary T. Berkery ("Berkery"), Charles Blankenship, Jr. ("Blankenship"),

- 1 -

H. Paulett Eberhart ("Eberhart"), Lisa Glatch ("Glatch"), James T. Hackett ("Hackett"), Thomas C. Leppert ("Leppert"), Teri P. McClure ("McClure"), Armando J. Olivera ("Olivera"), and Matthew K. Rose ("Rose") (collectively, the "Individual Defendants," and together with Fluor, "Defendants") for violations of Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of their fiduciary duties as directors and/or officers of Fluor, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fluor, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 18, 2025 to July 31, 2025, both dates inclusive (the "Relevant Period").

2.     Fluor is an engineering and construction company that provides fabrication and modularization, engineering, procurement, and construction ("EPC"), and project management

solutions across the globe. The Company is split into three main operating units: Urban Solutions, Energy Solutions, and Mission Solutions.

3.      Leading up to, and throughout the Relevant Period, the Urban Solutions segment was the Company's most profitable division. The Urban Solutions segment includes construction projects the Company has entered into with state Departments of Transportation, such as the Gordie Howe International Bridge ("Gordie Howe"), and highway projects such as 365 Lyndon B. Johnson ("I-365/LBJ") and Interstate 35E ("I-35") (collectively, the "Texas Highway Projects").

4.      On May 2, 2025, the Company held an earnings call to discuss its first quarter 2025 financial results (the "1Q 2025 Earnings Call"). On the 1Q 2025 Earnings Call, Defendant Breuer assured investors that the Company was mitigating the impact of ongoing economic uncertainty for the Company's clients, stating: "***Fluor's grow and execute strategy and supply chain acumen position us well to support these efforts, whether domestic or international. We're seeing clients forge ahead with their projects where there is a clear time to market driver. They're not slowing down.***"[1] Defendant Breuer also provided investors with an update regarding the Gordie Howe project, stating "[t]he Gordie Howe project is now 96% complete, and ***we're on track to hand over the US port of entry in July***, getting us closer to our completion date this fall."

5.      During the question-and-answer portion of the 1Q 2025 Earnings Call, in response to an analyst question regarding the Company's optimism in light of the Company's competitors delaying projects, Defendant Breuer stated "***we're working hand in hand with our clients with these mitigation strategies around the tariffs and other factors. We feel pretty strongly about the***

---

[1] Unless otherwise stated, all emphasis added.

*quality of the backlog and our ability to convert.*"

6.      The truth emerged on August 1, 2025, when the Company issued a press release announcing disappointing financial results for the second quarter of 2025 (the "2Q 2025 Earnings Press Release"). The 2Q 2025 Earnings Press Release announced the Company missed consensus estimates for non-GAAP Earnings Per Share ("EPS") and revenue. The Individual Defendants attributed to the guidance miss to, *inter alia*, "***cost growth and expected recoveries on three infrastructure projects, due to subcontractor design errors, the related schedule impacts, and price escalation.***"

7.      On an earnings call held the same day (the "2Q 2025 Earnings Call"), Defendant Breuer revealed the three infrastructure projects that impacted the Urban Solutions revenue were the Gordie Howe, I-635/LBJ, and I-35 projects.

8.      On this news, the price per share of Fluor's stock fell $15.35, or 27%, from a closing price of $56.77 per share on July 31, 2025, to close at a price of $41.42 per share on August 1, 2025.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Gordie Howe and the Texas Highway Projects were facing increasing costs because of subcontractor errors, delays, and price increases; (2) Fluor downplayed the potential impact reduced customer spending due to macroeconomic uncertainty was likely to have on the Company;

- 4 -

(3) the Company's 2025 full-year guidance was unreliable due to the overstatement of the Company's risk management strategy; and (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Fluor to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between February 2025 and June 2025, approximately 1.6 million shares of Fluor common stock were repurchased at artificially inflated prices, costing the Company approximately $72.3 million. As the Company's stock was actually worth only $41.42 per share, the price at which it was trading when markets closed on August 1, 2025, the Company overpaid for repurchases of its own stock by approximately $6.3 million in total.

11.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while one of the Individual Defendants engaged in improper insider sales, netting proceeds of over *$6 million.*

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Executive Chairman of the Board and former CEO, its former Chief Financial Officer ("CFO") and its CFO are named in a federal securities class action lawsuits pending in the United States District Court for the Northern District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from

the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's issuance of materially false and/or misleading statements, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Constable's, Breuer's, Regan's, and Brennan's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, the Company is headquartered in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Fluor. Plaintiff has continuously held Fluor common stock at all relevant times.

### Nominal Defendant Fluor

20.     Nominal Defendant Fluor is a Delaware corporation with its principal executive offices at 6700 Las Colinas Blvd. Irving, Texas 75039.  Fluor's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FLR."

### Defendant Constable

21.     Defendant Constable has served as Executive Chairman of the Board since May 2022 and previously served as CEO from 2021 until May 1, 2025.

22.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Constable made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 11, 2025 | 40,800 | $49.00 | $1,999,200.00 |
| June 16, 2025 | 40,000 | $50.15 | $2,006,000.00 |
| July 7, 2025 | 38,600 | $52.11 | $2,011,446.00 |

Thus, in total, before the fraud was exposed, he sold 119,400 shares of Company stock on inside information, for which he received approximately $6 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.     The Schedule 14A the Company filed with the SEC on March 13, 2025 (the "2025 Proxy Statement") stated the following about Defendant Constable:

> Mr. Constable brings to the Board extensive experience with, and knowledge of, the Company's business and strategy. His over 33 years of service at Fluor, including as Group President, and his perspective as a client during his role as Chief Executive Officer of Sasol, provide the Board with a unique perspective of the Company and its industry. In addition, his roles as a director at other public companies within the industries we operate give him the experience to provide valuable advice on commercial strategies and operational risk.

**Defendant Breuer**

24.     Defendant Breuer has served as the Company's CEO and as a Company director since May 1, 2025 and served as the Company's Chief Operating Officer ("COO") from August 2024 to May 1, 2025. He also serves as a member of the Executive Committee.

25.     The 2025 Proxy Statement states the following about Defendant Breuer:

> Mr. Breuer has spearheaded global operations and business development across multiple businesses at Fluor, with extensive experience in energy, chemicals, mining and metals. His extensive familiarity with our business and the engineering, procurement and construction industry makes him uniquely positioned to advise on the opportunities and challenges facing Fluor.

**Defendant Regan**

26.     Defendant Regan has served as the Company's CFO since March 1, 2025.

27.    The Company's website stated the following about Defendant Regan:[2]

John Regan serves as Executive Vice President, Chief Financial Officer (CFO) of Fluor Corporation. As CFO, John is responsible for all aspects of the Company's finances, including accounting, treasury and risk management, as well as interaction with investors and others in the financial community.

John was previously the Company's Chief Accounting Officer, where he was responsible for corporate accounting, consolidations and external financial reporting.

Before joining Fluor in 2020, John was Executive Vice President and CFO at alta Mesa Resources, Inc., an onshore oil and gas acquisition, exploration and production company. Before this, he held a number of senior financial executive roles in public oil and gas companies, including as the CFO for Vine Oil and Gas LP and Quicksilver Resources Inc. He also held various positions of increasing responsibility at Flowserve Corporation and PricewaterhouseCoopers.

John has a Bachelor of Business Administration degree in accounting from University of Miami. He is a Certified Public Accountant with more than 30 years of accounting and finance experience.

**Defendant Brennan**

28.    Defendant Brennan served as the Company's CFO from 2020 until March 1, 2025.

**Defendant Bennett**

29.    Defendant Bennett has served as a Company director since 2011. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee and the Organization and Compensation Committee.

30.    The 2025 Proxy Statement stated the following about Defendant Bennett:

Mr. Bennett brings a deep understanding of business operations, finance, sales and marketing, developed through his experience as a former Chief Executive Officer, Chief Financial Officer and Vice President of Sales and Marketing. His leadership roles at H&R Block and Aetna provide the Board with valuable public company insights into business strategy and financial planning. In addition, he brings almost 40 years of experience in accounting and financial matters to our Audit Committee.

---

[2] https://www.fluor.com/about-fluor/leadership/fluor-management-team

**Defendant Berkery**

31.    Defendant Berkery has served as a Company director since 2010. She also serves as the Chair of the Governance Committee and as a member of the Audit Committee and the Executive Committee.

32.    The 2025 Proxy Statement stated the following about Defendant Berkery:

Ms. Berkery's broad range of experience in financial, business and legal matters makes her a valued member of the Board. Her experience leading a $50 billion wealth management bank allows her to provide valued counsel on matters such as finance, banking arrangements, global business strategies, marketing and risk management. In addition, her 35 years in the legal field make her an excellent resource to the Governance Committee and the Board on legal and compliance matters.

**Defendant Blankenship**

33.    Defendant Blankenship has served as a Company director since March 1, 2025. He also serves as a member of the Audit Committee and the Commercial Strategies and Operational Risk Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Blankenship:

As chief executive officer and a director of a publicly traded company, Mr. Blankenship brings significant leadership, operational and financial experience to the Board. Mr. Blankenship also brings significant technical expertise associated with the specialty materials industry and aerospace and industrial equipment markets.

**Defendant Eberhart**

35.    Defendant Eberhart has served as a Company director since 2020. She also serves as a member of the Commercial Strategies and Operational Risk Committee and Organization and Compensation Committee.

36.    The 2025 Proxy Statement stated the following about Defendant Eberhart:

Ms. Eberhart's qualifications to serve on the Board include her many years of service as a Chief Executive Officer at both private and public companies. Her board service at other public companies, including as a lead director, provides valuable corporate governance experience. In addition, her many years of service as an executive at Electronic Data Systems Corporation bring valuable global operational, financial and accounting expertise to the Board, as well as knowledge of information technology matters.

**Defendant Glatch**

37.     Defendant Glatch has served as a Company director since 2024. She also serves as a member of the Audit Committee and the Commercial Strategies and Operational Risk Committee.

38.     The 2025 Proxy Statement stated the following about Defendant Glatch:

With more than 35 years of experience, Ms. Glatch has held several senior executive positions in business development, operations and project management. Her experience spans the public and private sectors in the energy, chemicals, environmental, mining, water and transportation industries. Her service within Fortune 500 companies in infrastructure, energy and liquified natural gas provides valuable perspective to our Board as our clients transition to sustainable infrastructure and energy solutions.

**Defendant Hackett**

39.     Defendant Hart has served as a Company director since 2016. He also serves as the Chair of the Organization and Compensation Committee and a member of the Commercial Strategies and Operational Risk Committee and the Executive Committee.

40.     The 2025 Proxy Statement stated the following about Defendant Hackett:

Mr. Hackett has extensive knowledge of the global oil and gas industry. His several decades of executive experience, as well as his experience serving on other public company boards and as a former Chair of the Board of the Federal Reserve Bank of Dallas, enable him to provide respected guidance on business strategy and financial matters, as well as perspective about the oil and gas markets.

**Defendant Leppert**

41.    Defendant Leppert has served as a Company director since 2019. He also serves as a member of the Commercial Strategies and Operational Risk Committee and the Governance Committee.

42.    The 2025 Proxy Statement stated the following about Defendant Leppert:

Mr. Leppert's diverse leadership background in the public and private sectors, both as a corporate chief executive officer and elected official, provides him with valuable experience in business, strategy, project management and governance. His prior service as Chief Executive Officer of The Turner Company provides unique insight and experience in the construction services industry.

**Defendant McClure**

43.    Defendant McClure has served as a Company director since 2020. She also serves as a member of the Audit Committee and the Governance Committee.

44.    The 2025 Proxy Statement stated the following about Defendant McClure:

Ms. McClure's long tenure as a senior executive and director of large, publicly traded companies makes her a valued member of our board. Her broad experience and expertise provide unique knowledge in human capital strategy and executive compensation, as well as compliance, regulatory, corporate governance and legal matters.

**Defendant Olivera**

45.    Defendant Olivera served as a Company director from 2012 until April 30, 2025. He also served as the Chair of the Commercial Strategies and Operational Risk Committee and as a member of the Executive Committee and the Governance Committee.

46.    The Schedule 14A the Company filed with the SEC on March 13, 2024 (the "2024 Proxy Statement") stated the following about Defendant Olivera:

Mr. Olivera's tenure as the former President and Chief Executive Officer of one of the largest electric utilities in the United States provides him with extensive knowledge of financial and accounting matters, as well as strong business leadership skills. Additionally, his experience as a consultant and his role as a

director of other public companies give him the experience to provide valuable advice from a governance, sustainability and risk perspective.

**Defendant Rose**

47.    Defendant Rose has served as a Company director since 2014. He also serves as a member of the Audit Committee and the Organization and Compensation Committee.

48.    The 2025 Proxy Statement stated the following about Defendant Rose:

Mr. Rose's qualifications include his extensive leadership experience gained from overseeing a large, complex and highly regulated organization, his considerable knowledge of operations management and business strategy and his deep understanding of public company oversight. In addition, his experience serving on other public company boards, as well as the board of the Federal Reserve Bank of Dallas, makes him a valuable contributor to our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

50.    Each director and/or officer of the Company owes to Fluor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein or aided and abetted the same.

52.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at Fluor had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Fluor's own Code of Business Conduct and Ethics for Members of the Board of Directors

("Code of Conduct and Ethics for Directors") and the Code of Business Conduct and Ethics ("Code of Conduct and Ethics").

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants at Fluor were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

58.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of Fluor's board of directors, each of the Individual Defendants who was a director of Fluor was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## FLUOR'S CORPORATE GOVERNANCE

### Code of Conduct and Ethics for Directors

64.     The Code of Conduct and Ethics for Directors states its purpose as:

The Board of Directors (the "Board") of Fluor Corporation (the "Company") has adopted the following Code of Business Conduct and Ethics (the "Code ") for directors of the Company. This Code is intended to focus the Board and each director on areas of ethical risk, provide guidance to directors to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability.

No code or policy can anticipate every situation that may arise. Accordingly, this Code is intended to serve as a source of guiding principles for directors. Directors are encouraged to bring questions about particular circumstances that may implicate one or more of the provisions of this Code to the attention of the Chair of the Governance Committee, who may consult with inside or outside legal counsel as appropriate.

Directors who also serve as officers of the Company should read this Code in conjunction with the Company's Code of Business Conduct & Ethics for its employees.

65.     The Code of Conduct and Ethics for Directors states, in relevant part, the director's responsibilities as:

The Board represents the interests of shareholders, as owners of a corporation, in optimizing long-term value by overseeing management performance on the shareholders' behalf. The Board's responsibilities in performing this oversight function include a duty of care and a duty of loyalty.

A director's duty of care refers to the responsibility to exercise appropriate diligence in overseeing the management of the Company, making decisions and taking other actions. In meeting the duty of care, directors are expected to:

***

- 18 -

• Remain properly informed about the Company's business and affairs. Directors should review and devote appropriate time to studying Board materials.

• Rely on others. Absent knowledge that makes reliance unwarranted, directors may rely on Board committees, management, employees, and professional advisors.

• Make inquiries. Directors should make inquiries about potential problems that come to their attention and follow up until they are reasonably satisfied that management is addressing them appropriately.

66.    In the section titled "Conflict of Interest," the Code of Conduct and Ethics for Directors in relevant part, states the following:

Directors should avoid conflicts between their own interests and those of the Company. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Chair of the Governance Committee. Directors should strive to avoid the appearance of a conflict of interest.

A "conflict of interest" occurs when a director's personal or business interests are adverse to the interests of the Company as a whole. A director's personal or business interests include the interests of an immediate family member or an organization with which a director or an immediate family member has a significant relationship. Conflicts of interest also arise when a director, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position as a director of the Company. A director's immediate family includes the director's spouse, parents, stepparents, children, stepchildren, siblings, mother- and father-in-law, sons- and daughters-in-law, brothers and sisters-in-law, and anyone (other than a domestic employee or tenant) who shares the director's home.

67.    In the section titled "Public Statements," the Code of Conduct and Ethics for Directors states the following:

Directors should not speak publicly on behalf of the Company unless pre-cleared by the Chairman of the Board, the Lead Independent Director, or the CEO. Directors are encouraged to avoid public comments that could be attributed to or could conflict with the Company's business or policy positions.

- 19 -

68.     In the section titled "Compliance with Laws, Rules and Regulations; Fair Dealing,"

the Code of Conduct and Ethics for Directors states the following:

> Directors must comply, and will oversee compliance by employees, officers and
> other directors, with laws, rules and regulations applicable to the Company,
> including insider trading laws.

> Transactions in Company securities are governed by the Company's policy entitled
> Prohibitions on Insider Trading as well as other insider trading memoranda
> distributed to members of the Board from time to time.

> Directors will oversee policies designed to promote fair dealing by employees and
> officers with the Company's customers, suppliers, competitors and employees.

69.     In the section titled "Encouraging the Reporting of Any Illegal or Unethical

Behavior," the Code of Conduct and Ethics for Directors states the following:

> Directors should promote ethical behavior and take steps to see that the Company:
> (a) encourages employees to talk to supervisors, managers and other appropriate
> personnel when in doubt about the best course of action in a particular situation; (b)
> encourages employees to report violations of laws, rules, regulations or the
> Company's Code of Business Conduct and Ethics for its employees to appropriate
> personnel; and (c) informs employees that the Company will not allow retaliation
> for reports made in good faith.

70.     In the section titled "Compliance Procedures," the Code of Conduct and Ethics for

Directors states the following:

> Directors should communicate any suspected violations of this Code promptly to
> the Chair of the Governance Committee. Violations will be investigated by the
> Board or by a person or persons designated by the Board and appropriate action
> will be taken in the event of any violations of the Code. Nothing in this Code limits
> a director's right or ability to communicate with government agencies regarding
> possible violations of law.

71.     In the section titled "Waivers of the Code," the Code of Conduct and Ethics for

Directors states the following:

> Waivers of this Code will be granted only in exceptional circumstances; however,
> waivers will not be granted with respect to section 7 above. Any waiver of the Code

- 20 -

may only be made by the Board or Governance Committee after disclosure of all material facts by the director seeking the waiver and will be promptly disclosed as required by law or New York Stock Exchange regulations.

### *Code of Conduct and Ethics*

72.    In the section titled "Getting Know our Code," the Code of Conduct and Ethics states in relevant part:

What is Our Code?

Our Code is the centerpiece of our commitment to conducting our business throughout the world with the highest standards of business ethics. It is a resource for you to use when you need information or guidance before making a decision. If your work involves projects in which the U.S. Government or its funds are involved, see the "U.S. Government Contracting" Supplement to our Code. However, our Code and its Supplement cannot cover every subject or situation you might face. If you need additional guidance, you can review more detailed policies and practices on Fluor's Intranet at www.onefluor.com or consult your local Human Resources manager. Our Code does not create contractual rights for you or others.

Why Do We Have a Code?

Fluor's success depends on our reputation for ethical business performance. Our Company has adopted global standards to help ensure that we conduct business fairly and honestly and interact ethically with each of our stakeholders – including fellow employees, clients, suppliers, competitors, governments, and communities. The Code describes our global standards and helps us understand the rules and principles governing the way we do business at Fluor.

Who Must Follow Our Code?

All employees of Fluor and its subsidiaries worldwide must adhere to our Code at all times.

***

What is Expected of Me?

As an employee, you are required to:

- Understand and follow the laws and regulations that apply to your job

- 21 -

- Read, understand, and follow our Code and the underlying policies and practices applicable to you
- If you are uncertain about how to do the right thing, seek guidance from your supervisor or other Fluor resources and use the steps in the "Doing the Right Thing" section of our Code
- Participate in any compliance training and certifications required by our Company ` Speak up in good faith and report any suspected violations of the Code using the steps set forth in the "Getting Help and Reporting Concerns" section of our Code
- Cooperate with any investigations into potential misconduct

The Company can only do something about misconduct if it knows about it.

***

What are the Consequences of Violating Our Code?

Violations of our Code can result in disciplinary action, up to and including termination. In appropriate cases, Fluor may also refer misconduct to appropriate authorities for prosecution. This may subject the individuals involved to civil and/or criminal penalties.

73.     In the Section titled "Getting Help and Reporting Concerns," the Code of Conduct and Ethics states in relevant part:

Whom Should I Contact with a Question or Concern Related to Our Code?

If you are ever unsure about the right thing to do in a business situation, you should seek guidance. If appropriate, speak directly with the person involved. You are also encouraged to contact any of the following:

- Your immediate supervisor
- Your supervisor's supervisor (and up the reporting structure, as necessary)
- Your local Human Resources manager or, if applicable, your Industrial Relations manager
- A Fluor Subject Matter Expert
- The Fluor Law Department or Corporate Compliance If you are uncomfortable discussing the matter with any of these resources or the response is inadequate, you should contact:
- Fluor's Compliance & Ethics Integrity Portal & Hotline (see contact information, page 38)

74.    Under the section titled "Ensuring Proper Financial Controls and Transparency,"

the Code of Conduct and Ethics states in relevant part:

Accurate, Full, and Fair Disclosure

As a publicly traded Company, Fluor's financial results must comply with generally accepted accounting principles and always be accurate, complete, fair, timely, and understandable.

The accuracy of our financial reports depends on every employee properly recording information such as time charges, change orders, project estimates, sales, expenses, costs, bills, payroll, and regulatory data. As an employee, you must properly verify that any financial information for which you are responsible is accurate, complete, and timely.

Because many projects take months or years to complete, our Company uses trained financial estimators to determine how much revenue and profit can be recognized for reporting financial results. These estimates depend on the accuracy of information provided by project managers and personnel.

Managers must take responsibility that adequate resources and oversight are devoted to properly implementing and following financial controls on all projects, at all locations, and at all times.

Pressure to Meet the Numbers

At Fluor, while we take job performance extremely seriously, we never let pressure to "meet the numbers" compromise our integrity.

- Never alter financial or other data to meet targets, help boost Fluor's financial figures or stock price, "save jobs," meet incentives or bonus plan targets, or for any other reason not related to actual financial performance.
- Never delay reporting negative financial results to management until the last minute. All financial information – whether positive or negative – needs to be reported accurately and timely.
- Never inappropriately hold back reserves, profits, or other contingencies when a project is doing well to protect against possible bad numbers at a later time.
- Never pressure or ask another employee to inappropriately alter, delay, or hide financial results or other information.

75.     In the same section, under the subsection "Insider Trading is Prohibited," the Code of Conduct and Ethics states:

> You may come across inside information about our Company, clients, or partners through your work with Fluor. Buying or selling the securities of a company while you are aware of inside information about that company, or inside information that could affect the share price of that company, is considered "insider trading." This is illegal, and so is "tipping," or advising others to buy or sell securities based on inside information.
>
> "Inside information" is material information that is not available to the public that a reasonable investor would likely consider important in making a decision to buy or sell a security. Remember that even information about events or actions that are not certain to happen, such as the possible new award or signing of a joint venture award, can be considered inside information.
>
> It is important for all employees to keep inside information confidential and not discuss it or allow it to be overheard by anyone inside or outside the Company, except on an authorized need-to-know basis.

76.     In the same section, under the subsection "When Can I Trade?" the Code of Conduct and Ethics states:

> Once material information has been disclosed publicly to the marketplace through established channels and the public has had enough time to absorb the information, you may trade in Fluor's or the related company's stock. Fluor's policy allows trading on and after the start of the third business day after material information is disclosed.
>
> Some Fluor officers and other employees are designated company "insiders" because of their regular access to material inside information. These insiders can only trade during specified trading windows and only with the pre-approval of the Chief Legal Officer.

77.     In the section titled "Avoiding and Resolving Conflicts of Interest," the Code of Conduct and Ethics states in relevant part:

> How Can I Know Whether a Conflict of Interest Exists?
>
> A conflict of interest occurs when your personal or financial interests interfere with your ability to make sound and objective business decisions on Fluor's behalf. You

need to avoid any situation that creates even the appearance of this kind of bias. A perceived conflict of interest that calls into question our business integrity can be as damaging to our reputation and business as the existence of an actual conflict.

TO DETERMINE WHETHER A CONFLICT OF INTEREST EXISTS, YOU SHOULD ASK YOURSELF:

Does this action or situation violate Company policies?
Would the action have the potential to affect my ability to make sound business decisions? Could it influence my objectivity or appear to do so?
Would my coworkers think the situation could affect how I do my job?
Would it look suspicious to someone outside our company, such as a client, supplier, shareholder, or the media?
Would it take revenue or profit away from Fluor?
Would I or my family members benefit financially or personally?

If you answered "yes" or "maybe" to any of these questions or need additional clarification, you should discuss the activity, financial interest, or relationship with your supervisor or your Human Resources manager immediately and make an online disclosure via Fluor's Compliance & Ethics Integrity Portal & Hotline before proceeding.

***

How Can I Resolve a Conflict of Interest?

Conflicts of interest may often be resolved if they are disclosed promptly. Transparency and the exercise of good judgment are basic expectations. If you feel that you or our Company may face an actual or potential conflict of interest, you should immediately disclose any potential conflicts of interest via Fluor's Compliance & Ethics Integrity Portal & Hotline and wait for receipt of a determination before proceeding. Always disclose any potential conflicts of interest in your annual ethics certification or as soon as the potential conflict arises.

78.    In violation of the Code of Conduct and Ethics for Directors and the Code of Conduct and Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation

of the Code of Conduct and Ethics for Directors and Code of Conduct and Ethics, the Individual

Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose

obtained waivers of violating the Code of Conduct and Ethics for Directors, and failed to comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report

violations of the Codes of Conduct and Ethics for Directors and the Code of Conduct and Ethics.

### FLUOR'S AUDIT COMMITTEE CHARTER

79.     The Company also maintains an Audit Committee Charter (the "Audit Committee

Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

> The Audit Committee (the "Committee") shall
>
> 1. Represent and assist the Company's Board of Directors in fulfilling its oversight
> responsibility for:
>
>> (a) the accounting, reporting and financial practices of the Company, including
>> the integrity of the Company's financial statements;
>> (b) the Company's compliance with legal and regulatory requirements;
>> (c) the independent auditor's qualifications and independence; and
>> (d) the performance of the Company's internal audit function and independent
>> auditor; and
>
> 2. Oversee preparation of the report that Securities and Exchange Commission
> ("SEC") rules require to be included in the Company's annual proxy statement.

80.     Under the section titled "PURPOSE AND ACTIVITES," in the subsection titled

"B. Responsibilities" the Audit Committee Charter states in relevant part:

> The Committee's responsibilities are set forth in this Charter. Among other things,
> it is the responsibility of the Committee to maintain free and open communication
> between the directors, the independent auditor, internal audit and the management
> of the Company. The Company's management is responsible, among other things,
> for preparing the financial statements and for the overall financial reporting
> process, including the Company's system of internal controls. The independent
> auditor's responsibilities include auditing the financial statements and expressing

an opinion on the conformity of the audited financial statements with U.S. generally accepted accounting principles.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company. The Committee has the sole authority to engage outside counsel and other advisors it determines to retain to carry out its responsibilities and shall receive appropriate funding from the Company, as determined by the Committee, for payment of (i) compensation to any such advisors, (ii) compensation to the independent auditor, and (iii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its responsibilities. To assist it in carrying out its responsibilities, the Committee 2 may form and delegate authority to subcommittees consisting of one or more members when appropriate.

As part of its responsibilities, the Committee shall, consistent with and subject to applicable law and rules and regulations promulgated by the SEC, the New York Stock Exchange (the "NYSE") or other regulatory authority:

*** 

6. Review and evaluate the qualifications, performance and independence of the independent auditor and the lead partner of the independent auditor, including considering whether the auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the auditor's independence. This evaluation shall take into account the opinions of management and the internal auditors.

7. Review and discuss with the independent auditor the Company's critical accounting policies and the matters required to be discussed by the independent auditor under the rules adopted by the Public Company Accounting Oversight Board, as they may be amended from time to time, including any audit problems or difficulties the independent auditor encountered in the course of its audit work and management's response.

8. Meet to review and discuss with the independent auditor and management the annual audited and quarterly financial statements of the Company, and the independent auditor's reports related to the financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

9. Recommend to the Board of Directors, based on the review and discussions described in paragraphs 4 and 6-8, whether the financial statements should be included in the Annual Report on Form 10-K.

10. Discuss with the Company's Chief Legal Officer, the Chief Financial Officer or Chief Compliance Officer, as applicable, legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports, inquiries or correspondence received from regulators or government agencies which raise material issues regarding the Company's financial statements or accounting policies.

***

14. Meet periodically and separately with the independent auditor, internal audit and management to review and discuss the adequacy and effectiveness of the internal controls of the Company (with particular emphasis on the scope and performance of the internal audit function).

15. Review and discuss with the independent auditor and management any major issues regarding the adequacy and effectiveness of the Company's internal controls and any significant changes in internal controls.

16. Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures with the independent auditor, internal audit and management.

17. Review as needed the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

***

19. Review earnings press releases and discuss, in a general manner, the types of information to be disclosed and the type of presentation to be made in the Company's earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies.

***

21. Coordinate and communicate with the Board's Commercial Strategies and Operational Risk Committee regarding the Company's strategic and operational risks, and other major risks that may be overseen by that Committee from time to time.

22. Review and discuss with management: (a) the Company's framework for identifying enterprise risks, including the overall enterprise risk management process, the methods of risk assessment, the risk mitigation strategies and the

overall effectiveness of the Company's guidelines, policies and systems with respect to risk assessment and management; and (b) the Company's significant enterprise risks, including those associated with the Company's overall financial reporting, disclosure process, legal matters, regulatory compliance, cybersecurity, information technology and data privacy, as well as accounting risk exposure and policies and procedures for derivative and foreign exchange transactions and insurance coverage.

***

25. Oversee preparation of the Committee's report required to be included in the Company's annual proxy statement under SEC rules.

26. Oversee the Company's compliance program with respect to legal and regulatory requirements and review the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the Chief Compliance Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's codes of conduct, including any matters involving criminal or potential criminal conduct.

27. Review and assess the Company's codes of conduct and ethics that are applicable to employees and management, at least annually, and recommend proposed material changes to the Board of Directors for approval.

***

29. Conduct an evaluation of the Committee's performance, at least annually, to assess whether it is functioning effectively.

30. Review the adequacy of this Charter, at least annually, and recommend any changes to the Governance Committee of the Board of Directors.

81.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross

- 29 -

mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82.     Fluor is an engineering and construction company that provides fabrication and modularization, EPC, and project management solutions across the globe. Fluor states that it provides services "throughout the project life cycle, from conceptual design, engineering, procurement and construction to the operations and maintenance of facilities."

83.     The Company is split into three main operating units: Urban Solutions, Energy Solutions, and Mission Solutions. The Company's Urban Solutions sector "provides innovative and sustainable solutions for the advanced technologies, infrastructure, life sciences, manufacturing, mining, metals, operations, maintenance and professional staffing markets." The Urban Solutions segment includes construction contracts with state Departments of Transportation, such as the Gordie Howe, I-365/LBJ, and I-35 construction projects. Leading up to, and throughout the Relevant Period, the Urban Solutions segment was the Company's most profitable division.

84.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and

prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that (1) the Gordie Howe and the Texas Highway Projects were facing increased costs because of subcontractor errors, delays, and price increases; (2) reduced customer spending due to macroeconomic uncertainty was likely to have a large impact on the Company; (3) the Company's 2025 full-year guidance was unreliable due to the overstatement of the Company's risk management strategy; and (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### False and Misleading Statements

#### *February 18, 2025 Press Release, 10-K, and Earnings Call*

85.     On February 18, 2025. The Company issued a press release announcing its fourth quarter 2024 and full-year 2024 financial results (the "FY 2024 Earnings Press Release"). The FY 2024 Earnings Press Release provided investors with guidance for the 2025 fiscal year, stating in relevant part:

> In consideration of the timing of new awards and the pace of execution on the existing backlog, ***we are establishing an adjusted EBITDA guidance for 2025 of $575 to $675 million and adjusted EPS of $2.25 to $2.75 per share***. Estimates for 2025 assume a tax rate of 30 to 35% percent.

86.     In the FY 2024 Earnings Press Release, Defendant Constable touted the Company's position in the market, stating:

> Our results for 2024 reflect our four-year journey ***of building a robust reimbursable backlog across diverse end markets, strengthening our capital structure, developing strong engineering and project execution teams***, and

commencing our capital allocation program . . . . ***These efforts have positioned Fluor to deliver significant value and opportunities for our clients, employees and shareholders.***

87.    The same day, the Company filed a Form 10-K with the SEC for its 2024 fiscal year (the "2024 Form 10-K"). The 2024 Form 10-K was signed by Defendants Constable, Brennan, Regan, Bennett, Berkey, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose. The 2024 Form 10-K also included certifications by Defendants Constable and Brennan, made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the 2024 Form 10-K and that the 2024 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made."

88.    The 2024 Form 10-K boasted the effectiveness of the Company's risk management strategy, stating in relevant part:

> We believe we have the ability to assess, mitigate and manage project risk, particularly in challenging locations or circumstances. Our experienced management and execution team employs a **systematic and disciplined approach** to identifying, assessing and managing risks. We believe that this risk management approach helps us control costs and adhere to clients' schedules.

(Emphasis in original).

89.    The 2024 Form 10-K also contained boilerplate warnings regarding seasonal fluctuations of customer spending, stating in relevant part:

> Our operations can be subject to seasonal and other variations. These variations are influenced by, among other things, weather, customer spending patterns, bidding seasons, receipt of required regulatory approvals, project timing and schedules, and holidays. For example, harsher weather conditions in winter may impact our ability to complete work in parts of North America and the holiday season schedule affects our productivity during this period. For these reasons, coupled with the number and significance of client contracts commenced and completed during a particular period, as well as the timing of expenses incurred for corporate initiatives, it is not unusual for us to experience seasonal changes or fluctuations in our quarterly operating results.

90.     Later the same day, the Company held an earnings call to discuss its fourth quarter and full-year 2024 financial results (the "FY 2024 Earnings Call").  Defendant Breuer provided investors with updates on the Company's Urban Solutions projects, stating in relevant part:

> ***Our infrastructure business continues to make good progress on the Gordie Howe project.*** Construction is now 94% complete, and handover of the U.S. port of entry is in progress. Substantial completion is targeted for Q3 of 2025.
>
> * * *
>
> On the I-635 LBJ project, construction is now 70% complete. Substantial completion is forecasted for Q2 of 2026.

### 2025 Proxy Statement

91.     On March 13, 2025, the Company filed the 2025 Proxy Statement. Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

92.     The 2025 Proxy Statement called for shareholder approval of, *inter alia*: (i) the election of Defendant Breuer and the reelection of Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to serve until the 2026 annual meeting of the stockholders; (ii) an advisory vote to approve the Company's executive compensation; and (iii) the ratification of Ernst & Young LLP as the Company's independent registered public accounting firm for 2025.

93.     With respect to "Risk Management Oversight," the 2025 Proxy Statement stated in relevant part:

**The Board**

Monitors how management operates the Company. When granting authority to management, approving strategies and receiving management reports, the Board considers the risks and vulnerabilities the Company faces. In addition, the Board discusses risks related to business strategy at an annual strategic planning meeting.

**Audit Committee**

Coordinates and communicates with the Board's Commercial Strategies and Operational Risk Committee regarding strategic and operational risks.

Reviews and discusses with management the framework for identifying enterprise risks, including the overall enterprise risk management process, the methods of risk assessment, the risk mitigation strategies and the overall effectiveness of guidelines, policies and systems with respect to risk assessment and management.

Reviews and discusses with management significant enterprise risks, including those associated with overall financial reporting, disclosure process, legal matters, regulatory compliance, cybersecurity, information technology ("IT") and data privacy, as well as accounting risk exposure and policies and procedures for derivative and foreign exchange transactions and insurance coverage.

**Commercial Strategies and Operational Risk Committee**

Coordinates and communicates with the Board's Audit Committee regarding risk assessment and risk management.

Reviews and discusses with management commercial strategies and operational risks, significant prospective and current projects, including major strategic and operational risks with respect to such prospects and projects, as well as risk identification, risk assessment and risk mitigation policies, procedures and practices for its strategic and operational risks.

**Organization and Compensation Committee**

Reviews compensation policies and programs, as well as the design of short-term and long-term incentive compensation, to confirm that they do not encourage unnecessary and/or excessive risk taking.

Responsible for overseeing employment, workplace, environmental, health and safety policies.

**Governance Committee**

Responsible for overseeing issues that may create governance risks, such as board

composition, director selection and the other critical governance policies and practices.

Reviews and discusses with management the operational, regulatory and reputational risks and impacts of sustainability, stakeholder and governance matters, including management of such risks and impacts.

94.    With respect to "Report of the Audit Committee," the 2025 Proxy Statement stated

the following:

The Audit Committee assists the Board in fulfilling its oversight responsibility for the:

■ Company's accounting, reporting and financial practices, including the integrity of its financial statements;
■ Company's compliance with legal and regulatory requirements;
■ independent registered public accounting firm's qualifications and independence; and
■ performance of the Company's internal audit function and independent registered public accounting firm.

In carrying out these responsibilities, the Audit Committee, among other things, supervises the relationship between the Company and its independent registered public accounting firm, including making decisions with respect to its appointment or removal, pre-approving the audit engagement and related fees and non-audit services and related fees and evaluating its independence. The Audit Committee oversees the mandatory rotation of the independent registered public accounting firm's lead engagement partner every five years, and the Audit Committee and its chair are also directly involved in the selection of the independent registered public accounting firm's new lead engagement partner. Ernst & Young LLP (EY), the Company's independent registered public accounting firm since 1973, last appointed a new lead engagement partner in 2022. The Audit Committee oversees and evaluates the adequacy and effectiveness of the Company's systems of internal and disclosure controls and oversees the internal audit function. The Audit Committee has the authority to investigate any matter brought to its attention and may engage outside advisors for such purpose.

Each member of the Audit Committee is independent within the meaning set forth in SEC regulations, NYSE standards and our Corporate Governance Guidelines, and the Board has further determined that Mr. Bennett and Mr. Rose are "audit committee financial experts" as such term is defined in SEC regulations. The Audit Committee acts pursuant to a charter, a copy of which can be found on our website at www.fluor.com.

- 35 -

Management is responsible for preparing the financial statements and for the overall financial reporting process, including the effective operation of the Company's system of internal controls. EY's responsibilities include auditing the financial statements and expressing an opinion on the conformity of the audited financial statements with U.S. generally accepted accounting principles and expressing an opinion on the Company's internal control over financial reporting. As part of its oversight, the Audit Committee reviewed and discussed with management and EY, the audited financial statements for the year ended December 31, 2024. The Audit Committee discussed with EY the matters that are required by the applicable requirements of the PCAOB and the SEC. The Audit Committee has received the written disclosures and the letter from EY required by applicable requirements of the PCAOB regarding the independent accountant's communications with the Audit Committee concerning independence. The Audit Committee has discussed with EY its independence from the Company and its management and considered the compatibility of non-audit services with the registered public accounting firm's independence.

Based on its review and discussions referred to above, the Audit Committee recommended to the Board that the audited financial statements be included in the 2024 Annual Report on Form 10-K, for filing with the SEC. The Audit Committee has also appointed EY as the Company's independent registered public accounting firm for 2025.

95.     Defendants Bennett, Berkery, Blankenship, Breuer, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, (1) the Gordie Howe and Texas Highway Projects were facing increased costs due to subcontractor design errors, price increases, and scheduling delays; (2) the Company downplayed the effect of macro-economic uncertainty would have on customer spending; (3) as a result, the Company's risk management strategy was overstated; (4) the Company's 2025 full-year guidance was misstated due to the overstatement of Fluor's risk management strategy; and (5) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at

all relevant times.

96.     The 2025 Proxy statement also failed to disclose, *inter alia*, that contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false an misleading statements.

97.     As a result of Defendants Bennett, Berkery, Blankenship, Breuer, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to elect Defendant Breuer and the reelection of Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *May 2, 2025 Press Release, 10-Q, and Earnings Call*

98.     On May 2, 2025, the Company issued a press release announcing its financial results for the first quarter of 2025 (the "1Q 2025 Earnings Press Release"). The 1Q 2025 Earnings Press Release revealed the Company was reaffirming full-year guidance even in light of economic uncertainty impacting customer projects, stating in relevant part:

> The company is engaging with clients to address the potential impacts of increased economic uncertainty on their projects. ***Based on our current assessment of our backlog, the performance of our segments and the economic environment, the company is maintaining its adjusted EBITDA guidance for 2025 of $575 to $675 million and adjusted EPS of $2.25 to $2.75 per share***. Estimates for 2025 assume a tax rate of 30 to 35% percent.

99.     Additionally, the 1Q 2025 Earnings Press Release quoted Defendant Breuer in highlighting the Company's growth stating:

> We are well positioned for the grow and execute chapter of our Building a Better

Future strategy. As we continue to deliver on our projects and take in quality backlog, we see substantial opportunities for growth in our key markets. Our businesses are focused on organic growth and our core competencies will deliver results that support our customers' needs . . . . Today, more than ever, clients can rely on Fluor's project delivery expertise to help navigate the complexities of the market.

100.    The 1Q 2025 Earnings Press Release also quoted Defendant Regan boasting the Company's risk management strategy and financial position, stating:

> **Today we are on a much more solid footing financially**, supported by a majority reimbursable backlog and a robust outlook for cash generation . . . . As we transition to supporting growth in the business over the next strategic planning period, we aim to enhance operating margins through project execution excellence, lean processes, **and risk management discipline**, all while maintaining our commitment to return capital to shareholders.

101.    The same day, the Company filed a Form 10-Q with the SEC for its first quarter of 2025 (the "1Q 2025 Form 10-Q"). The 1Q 2025 Form 10-Q was signed by Defendant Regan and included SOX certifications signed by Defendants Breuer and Regan attesting to the accuracy of the 1Q 2025 Form 10-Q and that the 1Q 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made.".

102.    The 1Q 2025 Form 10-Q discussed the performance of the Company's Urban Solutions segment, stating in relevant part:

> Revenue significantly increased in the 2025 Quarter due to the ramp up of execution activities on life sciences projects awarded in the last 18 months as well as revenue growth on a large metals project and a large mining project. The increase in 2025 revenue was further driven by progression to completion on a metals project in which there was a change in scope and removal of CFM.

> Segment profit increased in the 2025 Quarter due to an increase in execution activities on life sciences projects awarded in the last 18 months and a large metals project **as well as a decrease in cost due to design optimization on a highway project**. We also recognized profit on a metals project upon a change in percentage of completion due to a reduction in scope. **The increase in segment profit was partially offset by the effects of unfavorable foreign currency movements on an**

- 38 -

***international bridge project***. Segment profit margin in the 2025 Quarter was consistent with the 2024 Quarter.

New awards increased during the 2025 Quarter due to a large EPC award for a second multi-billion dollar pharmaceutical facility in Indiana and a construction contract for State Highway 6 in Texas. Backlog increased during the 2025 Quarter due to these 2 large awards. Our staffing business does not report new awards or backlog.

103.    Later the same day, the Company held the 1Q 2025 Earnings Call. On the 1Q 2025 Earnings Call, Defendant Breuer provided investors with an update on the Gordie Howe project, stating "[t]he Gordie Howe project is now 96% complete, and ***we're on track to hand over the US port of entry*** in July, getting us closer to our completion date this fall."

104.    Later in the 1Q 2025 Earnings Call, Defendant Breuer commented on the impact of economic uncertainty facing the Company and its clients, stating in relevant part:

> I wanted to share a few observations from my interactions with clients over the past few weeks in the context of the current economic sentiment. Our clients are always looking for the best way to deploy their capital on projects. Decisions include where to build, the size of facilities, the best supply chain solution and the timing of projects. ***Fluor's grow and execute strategy and supply chain acumen position us well to support these efforts, whether domestic or international. We're seeing clients forge ahead with their projects where there is a clear time to market driver. They're not slowing down.***
>
> However, there are some clients that are more sensitive to cost and GDP growth, and they require further market clarity and cost certainty before committing to final investment decisions. ***Nonetheless, these clients continue to issue work releases to advance the underlying engineering and design until full project awards are signed***. Looking at our remaining new awards outlook for this year, we are already engaged and providing services on over 90% of underlying award revenue.

105.    During the question-and-answer session of the 1Q 2025 Earnings Call, an analyst asked Defendant Breuer "to further elaborate on [his] prepared remarks regarding [his] conversations with clients." Defendant Breuer responded in relevant part:

> [W]e have been engaging with our clients at various levels including the very senior

levels of our key clients. And I would say that *most of the projects in the markets we're tracking- the fundamentals of those projects are still there, whether it's the time to market projects . . . . Those for sure are moving forward. But even the other ones that are more price sensitive and GDP growth and market certainty, those still have very sound fundamentals behind them.* What those clients are looking for is certainty in the environment . . . . [I]t's no surprise that the entire business community is watching very carefully what's happened with the trade negotiations when we're hopeful that there's going to be some good news on certain fronts in the coming days and weeks so that we can start seeing some clarity in broader picture*. But projects in energy, projects in copper, I would say are requiring a little bit more certainty, whereas projects in the ATLS [advanced technologies and life sciences] arena and project in the Mission Solutions space, I would say have greater clarity today and are proceeding as planned.*

106.    Analysts also inquired into Fluor's anticipated performance for the remainder of the year, noting that competitors to Fluor, such as Dow Corp., were facing delays with their projects. Defendant Breuer responded in relevant part:

Dow came out and very clearly explained the reasons for slowing down construction activities or not slowing down engineering and procurement, and it had to do with a combination of decisions around their market, the timing of the pricing of their products and so on. *We don't think[,] we're not seeing a trend of that in our other clients* . . . . Have people who are having yet FID [final investment decision] projects are expecting or looking for further clarity and certainty. *But we're not seeing a trend.*

And because we're involved on these projects and like [Defendant Regan] said, *we're working hand in hand with our clients with these mitigation strategies around the tariffs and other factors. We feel pretty strongly about the quality of the backlog and our ability to convert. The exact timing of the conversion may be a little uncertain. Maybe they push out just a tad, but we're not expecting significant underutilization compared to what the baseline was, say, a month or two ago.*

107.    In response to the same question, Defendant Regan followed up stating:

I think a couple of points. One, just part and parcel of our execution strategy is an early buyout on the procurement front. *So the things that are in backlog and ongoing tend to- it's our belief that they're going to continue moving forward*. And then maybe [Defendant Breuer]'s prepared remarks was also hinting at kind of the earnings potential of the backlog. *So even as things are slowing down, we are performing work on the vast majority of the things we see coming. And so*

- 40 -

*from an earnings potential kind of unmitigated there*, but obviously a *little bit* of disruption on the new award front.

108.    Analysts further inquired into the Fluor's confidence in its 2025 financial guidance despite macro-economic uncertainty, Defendant Breuer stated, in relevant part:

> *[T]he confidence comes in our close collaboration with these clients on the front end work*. And you look at whether it's copper, whether it's further additional pharmaceutical work, whether it's data centers. There's a midstream compression project in the US. There's a sustainable chemicals project. There's a project with a power and LNG component feeding a new power plant. These are real projects with clear economic incentives. Some of it is US based, some of it is international. So our diversification is helping us.
>
> There are some large opportunities out there . . . . *So despite the nervousness in the markets, some of these key strategic pursuits we feel are solid enough and have a compelling enough reason that we feel good about it.*

109.    The statements contained in ¶¶ 85-90, 98-108 were materially false and/or misleading because, in reality: (1) the Gordie Howe and Texas Highway Projects were facing increased costs due to subcontractor design errors, price increases, and scheduling delays; (2) the Company downplayed the effect of macro-economic uncertainty would have on customer spending; (3) as a result, the Company's risk management strategy was overstated; (4) the Company's 2025 full-year guidance was misstated due to the overstatement of Fluor's risk management strategy; and (5) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

110.    The truth emerged on August 1, 2025, when the Company issued the 2Q 2025 Earnings Press Release announcing disappointing financial results for the second quarter of 2025.

The 2Q 2025 Earnings Press Release revealed a second quarter non-GAAP EPS of $0.43, missing consensus estimated by $0.13, and revenue of $3.98 billion, missing consensus estimates by $570 million and representing a 5.9% year-over-year decline. The 2Q 2025 Earnings Press Release attributed the results on, *inter alia*, increased costs facing three infrastructure projects, stating, in relevant part:

> Urban Solutions reported a profit of $29 million in the second quarter compared to $105 million in the second quarter of 2024. ***Results reflect a $54 million net impact of cost growth and expected recoveries on three infrastructure projects, due to subcontractor design errors, the related schedule impacts, and price escalation.***

111. The 2Q 2025 Earnings Press Release also negatively revised guidance for the rest of the year, with adjusted EBITDA of $475 million to $525 million, down from $575 million to $675 million, and adjusted EPS of $1.95 per share to $2.25 per share, down from $2.25 per share to $2.75 per share. Fluor stated the revised guidance was due to "***client hesitation around economic uncertainty and its impact on new awards and project delays and results for the quarter[.]***"

112. The same day, Fluor held the 2Q 2025 Earnings Call. On the call, Defendant Breuer revealed the Gordie Howe, I-635/LBJ, and I-35 were the projects that negatively impacted the Company in the second quarter, stating, in relevant part:

> [I]nfrastructure experienced cost growth on 3 projects during the quarter. ***On Gordie Howe, cost increase in the second quarter as we experienced rework and additional efforts required to hand over both ports of entry.*** This project is now 97% complete and we expect substantial completion this fall. ***The 635/LBJ project experienced cost increases in construction materials as well as labor productivity impacts.*** This project is 78% complete with an expected substantial completion date in Q2 of 2026.
>
> Finally, ***on I-35 Phase 2 the project experienced increased costs due to a subcontractor default, third-party utility delays and mitigation costs related to these delays.*** This project is 58% complete and targeting substantial complete in

Q4 of 2026. To address the issues across these projects, we have increased operations oversight and strengthening the execution teams.

113.    On this news, the price per share of Fluor's stock fell $15.35, or approximately 27%, from a closing price of $56.77 per share on July 31, 2025, to close at a price of $41.42 per share on August 1, 2025.

## REPURCHASES DURING THE RELEVANT PERIOD

114.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spend an aggregate amount of approximately $72.3 million to repurchase approximately 1,594,331 shares of its own common stock at artificially inflated prices from February 2025 through June 2025.

115.    According to the 1Q 2025 Form 10-Q, between February 1, 2025 and February 28, 2025, the Company repurchased 583,904 shares of its own common stock at an average price per share of approximately $42.74, for a total cost to the Company of approximately $24,956,057.[3]

116.    As the Company's stock was actually worth only $41.42 per share, the price at closing on August 1, 2025, the Company overpaid by approximately $770,753 for repurchases of its own stock between February 1, 2025 and February 28, 2025.

117.    According to the 2Q 2025 Form 10-Q, between June 1, 2025 through June 30, 2025, the Company repurchased 1,010,427 shares of its own common stock at an average price of $46.87 per share, for a total cost to the Company of approximately $47,358,713.

---

[3] Upon information and belief, such repurchases were made during the Relevant Period.

118.    As the Company's stock was actually worth $41.42 per share, the price at closing on August 1, 2025, the Company overpaid by approximately $5,506,827 for repurchases of its own stock between June 1, 2025 and June 30, 2025.

119.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $6.3 million.

## DAMAGES TO FLUOR

120.    As a direct and proximate result of the Individual Defendants' conduct, Fluor has lost and expended, and will continue to lose and expend, many millions of dollars.

121.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

124.    Such losses include the Company's overpayment of approximately $6.3 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

125.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by three of the Individual Defendants.

126.    As a direct and proximate result of the Individual Defendants' conduct, Fluor has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

127.    Plaintiff brings this action derivatively and for the benefit of Fluor to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fluor unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

128.    Fluor is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

129.    Plaintiff is, and has been at all relevant times, a shareholder of Fluor. Plaintiff will adequately and fairly represent the interests of Fluor in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

130.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

131.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following eleven individuals: Defendants Constable, Breuer, Bennett, Berkery, Blankenship, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of these eleven Director-Defendants.

132.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

133.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

134.    Additional reasons that demand on Defendant Constable is futile follow. Defendant Constable served as Fluor's CEO from 2019 to April 30, 2025, as a director since 2019, and has served as Executive Chairman of the Board since May 1, 2025. He also serves as the Chair of the

Executive Committee. The Company provides Defendant Constable for his primary occupation. Thus, as the Company admits, Defendant Constable is a non-independent director. Defendant Constable has received and continues to receive lucrative compensation for his role as a CEO. Defendant Constable failed to correct and personally made many of the false and misleading statements and omissions that were made during the Relevant Period. As a trusted Company director, Defendant Constable conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Constable signed the 2024 Form 10-K. Defendant Constable also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of himself as well as Defendants Bennett, Berkery, Blankenship, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. Further, Defendant Constable's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Constable is named as a defendant in the Securities Class Action. For these reasons, Defendant Constable breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Breuer is futile follow. Defendant Breuer has served as a Company director and as its CEO since May 1, 2025, and served as Fluor's COO from August 2024 to May 1, 2025. He also serves as a member of the Executive Committee.

As such, the Company provides Defendant Breuer with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Breuer is a non-independent director. As Fluor's CEO and as one of its trusted directors, Defendant Breuer was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally made. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Breuer is named as a defendant in the Securities Class Action. For these reasons, Defendant Breuer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Bennett is futile follow. Defendant Bennett has served as a Company director since 2011. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee and the Organization and Compensation Committee. Defendant Bennett has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Bennett signed the 2024 Form 10-K. Defendant Bennett also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant

Breuer and the re-election of himself and Defendants Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Bennett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Berkery is futile follow. Defendant Berkery has served as a Company director since 2010. She also serves as the Chair of the Governance Committee and as a member of the Audit Committee and the Executive Committee. Defendant Berkery has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Berkery signed the 2024 Form 10-K. Defendant Berkery also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of herself and Defendants Bennett, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Berkery breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Blankenship is futile follow. Defendant Blankenship has served as a Company director since March 1, 2025. He also serves as

a member of the Audit Committee and the Commercial Strategies and Operational Risk Committee. Defendant Blankenship has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Blankenship solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of himself and Defendants Bennett, Berkery, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Blankenship breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Eberhart is futile follow. Defendant Eberhart has served as a Company director since 2020. She also serves as a member of the Organization and Compensation Committee and the Commercial Strategies and Operational Risk Committee. Defendant Eberhart has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Eberhart signed the 2024 Form 10-K. Defendant Eberhart also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant

Breuer and the re-election of herself and Defendants Bennett, Berkery, Blankenship, Constable, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Eberhart breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Glatch is futile follow. Defendant Glatch has served as a Company director since 2024. She also serves as the Chair of the Commercial Strategies and Operational Risk Committee and as a member of the Executive Committee and the Governance Committee. Defendant Glatch has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Glatch signed the 2024 Form 10-K. Defendant Glatch also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of herself and Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Glatch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Hackett is futile follow. Defendant Hackett has served as a Company director since 2016. He also serves as the Chair of the

Organization and Compensation Committee and as a member of the Commercial Strategies and Operational Risk Committee and the Executive Committee. Defendant Hackett has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Hackett signed the 2024 Form 10-K. Defendant Hackett also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of himself and Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Hackett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Leppert is futile follow. Defendant Leppert has served as a Company director since 2019. He also serves as a member of the Governance Committee and the Commercial Strategies and Operational Risk Committee. Defendant Leppert has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Leppert signed the 2024

Form 10-K. Defendant Leppert also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of himself and Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Leppert breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant McClure is futile follow. Defendant McClure has served as a Company director since 2020. She also has serves as a member of the Audit Committee and the Governance Committee. Defendant McClure has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant McClure signed the 2024 Form 10-K. Defendant McClure also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of herself and Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant McClure breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Rose is futile follow. Defendant Rose has served as a Company director since 2014. He also serves as a member of the Audit Committee and the Organization and Compensation Committee. Defendant Rose has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Rose signed the 2024 Form 10-K. Defendant Rose also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the election of Defendant Breuer and the re-election of himself and Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, and McClure to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor. For these reasons, Defendant Rose breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on the Board is futile follow.

146.    Defendants Bennett (as Chair), Berkery, Blankenship, McClure, and Rose (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the

Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, Code of Conduct and Ethics, and Code of Conduct and Ethics for Directors. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

147.    In violation of the Code of Conduct and Ethics for Directors, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct and Ethics and Code of Conduct and Ethics for Directors by failing to act with integrity, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and Ethics, Code of Conduct and Ethics for Directors, and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct and Ethics for Directors, are not disinterested, and demand is excused as to them.

148.    Fluor has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Fluor any part of the damages Fluor suffered and will continue to suffer thereby.

Thus, any demand upon the Director-Defendants would be futile.

149.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

150.     The acts complained of herein constitute violations of fiduciary duties owed by Fluor's officers and directors, and these acts are incapable of ratification.

151.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fluor. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Fluor, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

152.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Fluor to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

153.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
**Against the Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose for Violations of Section 14(a) of the Exchange Act**

154.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

157.    Under the direction and watch of Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) the Gordie Howe and the Texas Highway Projects were facing increased costs because of subcontractor errors, delays, and price increases; (2) reduced customer spending due to macroeconomic uncertainty was likely to have a large impact on the Company; (3) the Company's 2025 full-year guidance was unreliable due to the overstatement of the Company's risk management strategy; and (4) as a result, the Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose caused the Company to materially overstate its business, operational, and financial prospects. As a result of the foregoing, Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

158.    The 2025 Proxy Statement also failed to disclose, *inter alia*, that contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

159.    In the exercise of reasonable care, Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the election of the Company's directors.

160.     As a result of the material misstatements and omissions contained in the 2025 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) elect Defendant Breuer and re-elect Defendants Constable, Bennett, Berkery, Blankenship, Eberhart, Glatch, Hackett, Leppert, McClure, and Rose to the Board, thereby allowing them to continue breaching their fiduciary duties to Fluor; (2) approve, on an advisory basis, the compensation for the Company's executive officers; and (3) to ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2025.

161.     The Company was damaged as a result of the Defendants Bennett, Berkery, Blankenship, Constable, Eberhart, Glatch, Hackett, Leppert, McClure, Olivera, and Rose'smaterial misrepresentations and omissions in the 2025 Proxy Statement.

162.     Plaintiff, on behalf of Fluor has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

163.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth as above, as though fully set forth herein.

164.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Fluor. Not only is Fluor now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Fluor by the Individual

Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 1,594,331 of its own shares at artificially inflated prices, damaging Fluor.

165.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

166.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fluor not misleading.

167.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

168.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    The Individual Defendants, by virtues of their positions with Fluor and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Fluor and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercise the same to cause Fluor to engage in the illegal conduct and practices complained of herein.

171.    Plaintiff, on behalf of Fluor, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fluor's business and affairs.

174.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

175.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

rights and interests of Fluor.

176.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Fluor's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) costs associated with the Gordie Howe and the Texas Highway Projects were increasing because of subcontractor errors, delays, and price increases; (2) reduced customer spending due to macroeconomic uncertainty was likely to have a large impact on the Company; (3) the Company's 2025 full-year guidance was unreliable due to the overstatement of the Company's risk management strategy; and (4) as a result, the Individual Defendants caused the Company to materially overstate its business, operational, and financial prospects. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

177.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

178.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

179.    In additional breach of their fiduciary duties, the Individual Defendants caused Fluor to repurchase millions of shares of Company common stock while the price for said stock

was artificially inflated while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $6 million.

180.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, including failing to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fluor's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

181.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

182.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, Fluor has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

183.    Plaintiff, on behalf of Fluor has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

184.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.    By their wrongful acts, violations of law, and false and misleading statements and

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fluor.

186.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Fluor that was tied to the performance or artificially inflated valuation of Fluor or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

187.    Plaintiff, as a shareholder and representative of Fluor, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

188.    Plaintiff, on behalf of Flour, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fluor, for which they are legally responsible.

191.    As a direct and proximate result of the Individual Defendants' abuse of control, Fluor has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Fluor has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.    Plaintiff, on behalf of Fluor, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fluor in a manner consistent with the operations of a publicly held corporation.

195.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fluor has sustained and will continue to sustain significant damages.

196.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

197.    Plaintiff, on behalf of Fluor, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fluor to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

200.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

201.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

202.    Plaintiff, on behalf of Fluor, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Constable, Breuer, Regan, and Brennan for Contribution Under Sections 10(b) and 21D of the Exchange Act

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    Fluor and Defendants Constable, Breuer, Regan, and Brennan are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Constable's, Breuer's, Regan's, and Brennan's willful and/or reckless violations of their obligations as officers of Fluor.

205.    Defendants Constable, Breuer, Regan, and Brennan's because of their positions of control and authority as officers of Fluor, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of Fluor, including the wrongful acts complained

of herein and in the Securities Class Actions.

206.    Accordingly, Defendants Constable, Breuer, Regan, and Brennan are liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act

207.    As such, Fluor is entitled to receive all appropriate contribution or indemnification from Defendants Constable, Breuer, Regan, and Brennan.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Fluor, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Fluor;

(c)    Determining and awarding to Fluor the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Fluor and the Individual Defendants to take all necessary actions to reform and improve Fluor's corporate governance and internal procedures to comply with applicable laws and to protect Fluor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the

following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Fluor to nominate at least six candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Fluor restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

    Plaintiff hereby demands a trial by jury.

Dated: October 16, 2025

                  **THE BROWN LAW FIRM, P.C.**

                  */s/ Saadia Hashmi*
                  Saadia Hashmi

767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Roberto Medina, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 13__ day of October, 2025.

Signed by:

_____
Roberto Medina